IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

*Respondent*,

v.

ALFRED CHEESE, III,

*Petitioner*.

Criminal No. ELH-98-0259

## MEMORANDUM OPINION

Defendant Alfred Cheese, III, through counsel, filed an "Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)." ECF 915 (the "Motion"). The Motion is supported by multiple exhibits. The government opposes the Motion in a two-page letter. ECF 921.  Defendant replied (ECF 923) and filed a supplemental reply.  ECF 926.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion.

## I.      Background

This case has a long history.  In a Memorandum Opinion of July 2, 2020 (ECF 911), I addressed Cheese's motion to reduce his sentence, filed pursuant to Section 404 of the First Step Act of 2018. ECF 903; *see* First Step Act of 2018 ("2018 FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5222 (2018). There, I recounted at length the factual and procedural background of this case. ECF 911 at 2-9. Accordingly, I need not restate the background again. Instead, I shall incorporate by refence the factual and procedural summary outlined in ECF 911, and restate here only those facts needed for context. I shall also supplement the facts to add current developments.

This case originated in 1998, when the government lodged charges against defendant and a host of others who were involved in drug trafficking in Baltimore. ECF 1.[1]  A Second Superseding Indictment (ECF 306) named 16 defendants.

Cheese was one of several defendants who proceeded to a jury trial in September 1999, at which Judge Benson E. Legg presided. *See* Docket. As to Cheese, the government had filed a notice of enhancement under 21 U.S.C. § 851.

According to the Docket, the trial took 33 days.[2]  On November 23, 1999, as to Cheese, the jury returned a verdict of guilty as to one count of conspiracy to distribute heroin, cocaine, and cocaine base ("crack"), in violation of 21 U.S.C. § 846, and two counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). ECF 356; ECF 910, ¶ 2.

On March 14, 2000, Judge Legg sentenced Cheese to concurrent terms of life imprisonment as to each count. ECF 420 (Judgment). At that time, the sentencing guidelines were mandatory, not advisory. Defendant's convictions and sentence were affirmed by the Fourth Circuit in November 2001, in a consolidated appeal pertaining to several codefendants.  *See* ECF 468; *United States v. Johnson*, 26 F. App'x 111 (4th Cir. 2001) (per curiam), *cert. denied*, 535 U.S. 949 (2002).[3]

Cheese filed numerous post conviction matters.  The case was reassigned to me in November 2012.  *See* Docket.  In a Memorandum and Order of April 16, 2013 (ECF 816, ECF

---

[1] Electronic filing did not begin until March 10, 2008, with ECF 615.

[2] On appeal, the Fourth Circuit stated that the trial took 30 days.  *See United States v. Johnson*, 26 F. App'x 111, 115 (4th Cir. 2001) (per curiam).  The discrepancy is not material.

[3] As to Cheese, the Fourth Circuit stated that his life sentence as to the drug conspiracy (Count Three) was erroneous, but the error was of no moment because he received statutory maximum life sentences under 18 U.S.C. § 924(e) for his two firearms convictions.  *Johnson*, 26 F. App'x at 117.  In contrast, the sentences of three codefendants were vacated and remanded.

817), I denied four motions filed by Cheese, including a second sentence reduction motion.  It was based on U.S.S.G. Amendment 748.

Of relevance here, on January 27, 2020, through counsel, Cheese filed a motion to reduce his sentence to time served, pursuant to Section 404 of the 2018 FSA.  ECF 903 (the "Section 404 Motion").  It was supported by numerous exhibits. Section 404 of the 2018 FSA made the provisions of the Fair Sentencing Act of 2010 available to a defendant, such as Cheese, who was sentenced prior to August 3, 2010, with regard to a crack cocaine offense.

By Memorandum Opinion (ECF 911) and Order (ECF 912) of July 2, 2020, I granted Cheese's Section 404 Motion, in part. In particular, I reduced Cheese's life sentence to 28 years of imprisonment (336 months), with credit for time served since April 9, 1998.

Defendant, who was born in December 1964, is now 56 years of age. He is currently incarcerated at FCI Hazelton.  Defendant has served 274 months of his 336 month sentence, exclusive of good conduct credit, which amounts to roughly 82%. Cheese has a projected release date of February 14, 2022.  ECF 915 at 2. And, he could be released to a halfway house months earlier.

In my Memorandum Opinion of July 2, 2020, I noted that Cheese has experienced several serious health challenges while incarcerated. ECF 911 at 18. These included persistent bleeding over several years due to large internal and external hemorrhoids (a condition for which Cheese received surgery in September 2010); recurring migraines; hypertension; degenerative joint disease; spondylolisthesis of lumbar region; lumbar spinal stenosis, for which he underwent surgery in 2019; and bilateral leg paresthesia. ECF 915; *see* ECF 915-2 (Medical Records). However, although defendant's health was a consideration, his health condition was not central to my ruling.

Notably, at the time of the defense submission of the Section 404 Motion on January 27, 2020 (ECF 903), defense counsel was unaware that the defendant had symptoms suggestive of lung cancer.  As of that time, defense counsel had only been able to obtain Cheese's medical records dating to November 4, 2019. ECF 915 at 2 n.2.  For approximately two months between December 2019 and January 2020, Cheese was hospitalized after he contracted pneumonia following back surgery. *Id.* at 2-3. During that period, Cheese was not allowed to contact his counsel or his family. *Id.*  As a result, Cheese's attorney was not aware of Cheese's increasingly deteriorating health condition.[4]

Moreover, and significantly, counsel was unaware that a CT scan on November 29, 2019, revealed "multiple stable nodules less than 1 cm." ECF 915-2 at 51. And, in December 2019, Cheese was diagnosed with a low white blood cell count. *Id.* Cheese's physician noted that Cheese "has symptoms of developing pneumonia again" and recommended a "full evaluation with Pulmonary, Infectious Disease and possible hematology/oncology [to determine] if there is an underlying immunodeficiency or cancer component to this." *Id.* at 51-52.

Thereafter, in January 2020, Cheese underwent another CT scan of his chest. *Id.* at 43. The nurse practitioner reviewing the results noted "some improvement to left lower lobe nodule" and recommended a follow-up CT scan in three months. *Id.* However, Cheese did not receive the follow-up CT scan until July 30, 2020, some eight months after his last scan, and almost a month after I issued my ruling in response to the Section 404 Motion. *Id.* at 22. The July 2020 scan revealed that a left lower nodule had increased in size and a new nodule had developed. *Id.* at 22-

---

[4] The defendant's reply was filed March 29, 2020.  ECF 906.  There, the defense referenced the defendant's development of pneumonia after his surgery in September 2020, and indicated that the defendant was hospitalized for two months.  *Id.* at 8.

23. Given the multiple left-sided pulmonary nodules, the physician assistant reviewing the scan recommended a PET CT scan to determine if Cheese has lung cancer. *Id.* at 23.

Cheese wavered for a few weeks about whether to schedule the PET CT scan because he was concerned that the scheduling of a medical procedure might delay his placement in a halfway house. ECF 915 at 5. But, on September 14, 2020, Cheese returned to health services to request the scan. *Id.* The assessment from that appointment stated that "PET scan will be reordered and try and schedule asap." ECF 915-2 at 5. It also noted that Cheese's white blood cell count had decreased since his last assessment in September and his liver enzymes were abnormal. *Id.*

On September 22, 2020, Cheese reported pain to his right thoracic back whenever he took a breath, sneezed, or bent over. *Id.* at 1. At that time, medical again noted that Cheese "has had testing that is concerning for malignancy," and he is "await[ing] further imaging/consults." *Id.* However, according to counsel, as of December 2020, Cheese had not yet received the PET scan or a definitive diagnosis. ECF 915 at 6.

The defendant submitted an administrative request for compassionate release in October 2020. ECF 915-3. The Bureau of Prisons ("BOP") denied the request on October 16, 2020. *Id.* The government concedes that the defendant has exhausted his administrative remedies. ECF 921 at 1.

## II.     Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is

"expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may

petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to qualify for relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§

1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§

1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community

(§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be

based on circumstances involving illness, declining health, age, exceptional family circumstances,

as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to

U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets
> the requirements of subdivision (2), extraordinary and compelling reasons exist
> under any of the circumstances set forth below:
>
> (A)   **Medical Condition of the Defendant**.—
>
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and
>> advanced illness with an end of life trajectory). A specific prognosis of life
>> expectancy (*i.e.*, a probability of death within a specific time period) is not
>> required. Examples include metastatic solid-tumor cancer, amyotrophic
>> lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I)  suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of
>>> the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care
>> within the environment of a correctional facility and from which he or she is
>> not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where

the defendant is at least 65 years of age, has serious physical or mental health issues, and has served

at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family

Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce

a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.   COVID-19[5]

---

[5] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[6]   The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393, (6th Cir. 2020).  Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

---

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

The Court must also underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. To be sure, many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted). As of January 31, 2021, COVID-19 has infected more than 26 million Americans and caused over 441,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jan. 31, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus. But, the country has recently seen the rollout of two vaccines for COVID-19 (Pfizer and Moderna). The vaccines initially were made available to health care workers and the elderly in nursing homes, but the category of eligible persons has expanded recently. Nevertheless, the rollout has not been as expeditious as had been hoped.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) is "align[ed] with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Therefore, prisoners at heightened risk receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-

prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As of February 6, 2021, the BOP had 123,452 federal inmates and 36,000 staff. And, by that date, the BOP had administered 39,288 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 6, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance.  *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes.  *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more

likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954

15

F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[7]  As of February 6, 2021, the BOP reported that 2,205 inmates out of 123,452 inmates, and 1,729 BOP staff out of 36,000 staff, currently tested positive for COVID-19; 44,182 inmates and 4,497 staff have recovered from the virus; and 216 inmates and three staff members have died from the virus. Moreover, the BOP has completed 102,082 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 6, 2021).  *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

With respect to FCI Hazleton, where the defendant is a prisoner, as of February 6, 2021, the BOP reported that only two inmates out of 1,288 inmates have tested positive for COVID-19 and 287 inmates and 18 staff have recovered at the facility. There have been no reported deaths. And, 321 staff and 327 inmates have been fully inoculated with the COVID-19 vaccine.  *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 6, 2021).

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

## IV.  Discussion

Cheese has moved for compassionate release on the ground that his deteriorating health conditions render him particularly vulnerable to COVID-19. ECF 915 at 6-10. As noted, Cheese suffers from a host of serious medical conditions. And, although the diagnosis has not been confirmed at this time, the government acknowledges that medical professionals believe that Cheese may have cancer. ECF 921 at 2.

Of concern to the Court, Cheese apparently has not received timely diagnostic testing. For instance, in January 2020, a nurse practitioner reviewing Cheese's scan recommended a follow-up CT scan in three months. ECF 915-2 at 43. But, Cheese did not receive the follow-up CT scan until July 30, 2020, eight months after it was recommended. *Id.* at 22. The July 2020 scan revealed that Cheese's condition was likely getting worse because one nodule had increased in size and a new nodule had developed. *Id.* at 22-23. Therefore, the physician assistant reviewing the scan recommended a PET CT scan to determine if Cheese has lung cancer. *Id.* at 23. Although Cheese wavered about the test, fearful that it would delay his release, he subsequently agreed to the test. Yet, to date, it appears that Cheese has not received this scan or a definitive medical diagnosis.

The government acknowledges that, if it is confirmed that Cheese has cancer, he would be considered eligible for compassionate release. ECF 921 at 2. Nevertheless, it opposes Cheese's release, asserting that the 18 U.S.C. § 3553(a) factors militate against a further reduction of his sentence. *Id.*

To be sure, if Cheese has lung cancer, as suspected, then he would certainly be at a greater risk for severe illness from COVID-19 and eligible for relief. The CDC identifies cancer as a COVID-19 risk factor. *People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.  But, even without

cancer, Cheese's declining health, coupled with his documented medical conditions, including hypertension, put him at a higher risk for severe consequences from the virus. And, the CDC cautions that the "more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. In addition to hypertension, Cheese suffers, *inter alia*, from persistent bleeding due to hemorrhoids, degenerative joint disease, and lumbar spinal stenosis.

Numerous courts have found that, in light of the COVID-19 pandemic, serious chronic medical conditions, including hypertension, qualify as compelling reasons for compassionate release. *See, e.g., United States v. Salvagno,* No. 5:02-cr-00051-LEK, 2020 WL 3410601 (N.D.N.Y June 22, 2020) (granting compassionate release to inmate whose sole medical condition is hypertension); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Patterson*, TJS-20-1078, 2020 WL 2217262, at *3 (D. Md. May 7, 2020) ("There is ample evidence that people with hypertension are more likely to experience complications if they become infected with COVID-19"); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]").

Accordingly, I am satisfied that Cheese satisfies the "extraordinary and compelling" prong of the § 3582 analysis.

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

U.S.S.G. § 1B1.13(2).  To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

In its opposition to the Motion, the government urges the Court not to reduce Cheese's sentence because Cheese was a leader of a violent drug trafficking organization. ECF 921 at 2.

Cheese points to his post-offense rehabilitation as evidence of how much he has changed since his involvement in the drug trafficking organization. ECF 915 at 10-12. In addition, he notes that he has two potential release plans. Cheese's brother, Linnard Cheese, who resides in Dundalk, Maryland, is prepared for Cheese to live with him immediately. *Id.* at 11. Alternatively, Cheese's brother-in-law, Maynord Bradley, is in the process of moving to a larger house in Delaware and will welcome Cheese to his new home, depending on the timing of Cheese's release. *Id.*

I considered the sentencing factors at length in my Memorandum Opinion of July 2, 2020. ECF 911 at 15. I found that Cheese has been a model prisoner who has made every effort to turn his life around while incarcerated, which bodes well for a positive outcome upon his release. *Id.* at 17-18. Moreover, I noted that, given the defendant's age and his health challenges, he poses a reduced risk of recidivism. *Id.* at 18. Based on these factors, I concluded that a reduction in

19

Cheese's sentence was amply warranted. That conclusion remains true upon consideration of the instant Motion as well.

It is also noteworthy that Cheese's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

Considering Cheese's deteriorating health, his efforts toward rehabilitation, and his good behavior, I conclude that Cheese's incarceration for a period of more than 22 years is sufficient to serve the sentencing goals of incapacitation, deterrence, retribution, and rehabilitation. Accordingly, I find that the factors under 18 U.S.C. § 3553(a) weigh in favor of reducing Cheese's sentence to time served plus fourteen days, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), with the added requirement of six months of home confinement as a condition of supervised release.

## V.  Conclusion

For the forgoing reasons, I shall grant the Motion (ECF 905), pursuant to 18 U.S.C. § 3982(c)(1)(A)(i).  Therefore, the defendant's sentence shall be reduced to time served plus 14 days. I shall adopt all of the previously imposed conditions of supervised release.  And, as an added condition of supervised release, I will require a period of home confinement of six months.

An Order follows, consistent with this Memorandum Opinion.

Date:   February 9, 2021                                              /s/
                                                        _____
                                                        Ellen Lipton Hollander
                                                        United States District Judge